CULLEN DISTRIBUTING, INC., Plaintiff-Appellee, v. DUANE PETTY, Defendant-Appellant.

Fourth District   No. 4—87—0287

Opinion filed December 31, 1987.—Rehearing denied January 28, 1988.

314

LUND, J., specially concurring.
GREEN, P.J., concurring in part and dissenting in part.

Donald R. McClarey, of Strufe & McClarey, of Dwight, for appellant.

Stephen C. Myers, of Myers, Daugherity, Berry & O'Conor, Ltd., of Streator, for appellee.

JUSTICE KNECHT delivered the opinion of the court:
Plaintiff Cullen Distributing, Inc., brought an action against defendant Duane Petty for damages caused by assurances defendant included in a bulk transfer notice. After a bench trial, the Livingston County circuit court entered judgment for plaintiff in the amount of $8,030.07. Defendant appeals.

For several months in 1985, defendant negotiated with Walter and Anne Davenport (Davenport) to buy their grocery store, the Pontiac Eisner Agency Food Store. In anticipation of that transaction, defendant's attorney mailed a "short form" bulk transfer notice dated September 21, 1985, to all the creditors of the store. The notice stated: "All debts of Walter E. Davenport, doing business as Pontiac Eisner Food Store will be paid in full as they fall due as a result of this transaction, and all future bills should be sent to him at 424 West Reynolds Street, Pontiac, Illinois, 61764."

On a weekly basis, plaintiff supplied cigarettes, cigars, tobaccos and candy to Davenport's grocery store. On September 19, 1985, plaintiff received Davenport's check for merchandise. The check was returned because of insufficient funds. Subsequently, plaintiff received the bulk transfer notice and in reliance thereon supplied Davenport with additional merchandise worth $1,056.81 on September 26, 1985. Prior to this shipment, Davenport's account balance was $8,030.07.

On October 7, 1985, defendant purchased the grocery store from Davenport. At that time, Eisner Food Store, Inc. (Eisner, Inc.), and Pontiac National Bank held liens against the store's assets for $24,000 and $70,000, respectively. The purchase price of $40,000 for equipment and $36,718 for inventory was paid directly to the secured creditors.

Davenport filed for bankruptcy soon after the sale and the account balance with plaintiff remained unsatisfied. Plaintiff retained counsel, and in a correspondence to the latter, defendant's attorney denied the bulk transfer notice promised Davenport's account would be paid from the sale proceeds. His letter stated:

"We knew from the beginning of our negotiations with Mr. Davenport that there would not be sufficient funds available to even satisfy the secured creditors Pontiac National and Eisners. Mr. Davenport, however, assured us that he would pay his delinquent accounts from other funds which is why the notice was so worded."

On January 14, 1986, plaintiff filed suit against defendant and Davenport. After several amendments, plaintiff settled on a five-count complaint. Count I alleged the sale was void as to plaintiff under the Illinois Uniform Commercial Code—Bulk Transfer (Code) in article 6. (Ill. Rev. Stat. 1985, ch. 26, pars. 6—101 through 6—110.) Count II alleged fraud, count III, promissory estoppel, and count IV sought damages as a third-party beneficiary. Count V asserted a cause of action for breach of the implied contract between plaintiff and defendant arising out of representations made in the bulk transfer notice.

In its affirmative defense, defendant asserted plaintiff was not damaged by the representations made in the bulk transfer notice. All of the store's assets were subject to liens by Eisner, Inc., and Pontiac National Bank. There simply was not enough money to pay off plaintiff.

At a bench trial on March 24, 1987, the court found for plaintiff on counts I through IV and dismissed count V. On plaintiff's motion, Davenport was dismissed as a party defendant with prejudice.

The bulk transfer notice provisions in the Uniform Commercial

Code, article 6, were designed to avoid manipulative transactions denying payment to the transferor's creditors. The Code drafters created an optional provision to insure creditors are paid out of the consideration for the bulk transfer. However, about two-thirds of the States, including Illinois, rejected optional section 6—106. That section reads as follows:

"[§6—106. APPLICATION OF THE PROCEEDS

In addition to the requirements of the two preceding sections:

(1) Upon every bulk transfer subject to this Article for which new consideration becomes payable except those made by sale at auction it is the duty of the transferee to assure that such consideration is applied so far as necessary to pay those debts of the transferor which are either shown on the list furnished by the transferor (Section 6—104) or filed in writing in the place stated in the notice (Section 6—107) within thirty days after the mailing of such notice. This duty of the transferee runs to all the holders of such debts, and may be enforced by any of them for the benefit of all.

(2) If any of said debts are in dispute the necessary sum may be withheld from distribution until the dispute is settled or adjudicated.

(3) If the consideration payable is not enough to pay all of the said debts in full distribution shall be made pro rata.]

Note: This section is bracketed to indicate division of opinion as to whether or not it is a wise provision, and to suggest that this is a point on which State enactments may differ without serious damage to the principle of uniformity." 2A U.L.A. 311-12 (1977).

"[T]he effect of choosing not to adopt [official section 6—106] is to enact a creditor-notice statute rather than a creditor-protection statute." (*Bjork v. United States* (7th Cir. 1973), 486 F.2d 934, 935 n.1.) The Illinois Code Comment to section 6—104 discusses various remedies available to creditors for noncompliance with article 6. However, the comment specifically states that "creditors may not proceed against the transferee upon the theory that by reason of the transfer he has personally assumed the obligations of the transferor." (Ill. Ann. Stat., ch. 26, par. 6—104, Ill. Code Comment, at 641 (Smith-Hurd 1963).) Similarly, in *Continental Casualty Co. v. Burlington Truck Lines, Inc.* (1966), 70 Ill. App. 2d 405, 408, 217 N.E.2d 293, 295, the court held "that a failure to comply with the provisions of the Bulk Sales Act gives no direct remedy by a vendor's creditors against the vendee, and does not make the vendee a debtor of the

vendor's creditors." *Noncompliance* with the act merely means the transfer is ineffective against the transferor's creditors. (Ill. Ann. Stat., ch. 26, par. 6—104, Uniform Commercial Code Comment at 642 (Smith-Hurd 1963).) Neither the Code nor its comments provide a remedy for *improper* compliance with notice provisions of article 6.

The article 6 notice provisions as adopted by Illinois are contained in sections 6—105 and 6—106. Section 6—106 contains two alternative forms of notice commonly referred to as the short and long forms. The transferee is to use the short form if he knows "all the debts of the transferor are to be paid in full as they fall due *as a result of the transaction.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 26, par. 6—106(1)(c).) The long form provides:

"(2) If the debts of the transferor are not to be paid in full as they fall due or if the transferee is in doubt on that point then the notice shall state further:

(a) the location and general description of the property to be transferred and the estimated total of the transferor's debts;

(b) the address where the schedule of property and list of creditors (Section 6—104) may be inspected;

(c) whether the transfer is to pay existing debts and if so the amount of such debts and to whom owing;

(d) whether the transfer is for new consideration and if so the amount of such consideration and the time and place of payment." (Ill. Rev. Stat. 1985, ch. 26, par. 6—106(2).)

Section 6—106(2) "requires the parties to disclose the transaction with greater particularity to the transferor's creditors where the transferor is or may be insolvent." Ill. Ann. Stat., ch. 26, par. 6—106(2), Ill. Code Comment, at 653 (Smith-Hurd 1963).

We now consider the merits of the parties' arguments. Initially, we note defendant complied with article 6 when he gave plaintiff notice of the bulk transfer; however, the compliance was *improper* because the notice was drafted in the short form rather than the long form. Per the defense attorney's letter, defendant knew from the start of negotiations Davenport would not be able to pay all of his creditors *as a result of the transaction.* Defendant had notice of the liens and was aware, prior to closing the deal, that Walt Davenport did not have employment lined up for after the sale. These facts should have raised some doubt in defendant's mind as to the Davenports' solvency and their ability to pay creditors as the bills came due. The long form clearly would have been more appropriate under the circumstances.

The most important question before us on appeal is raised by counts I and III: whether plaintiff relied to its detriment on statements contained in the short form bulk transfer notice. Detrimental reliance is a necessary element of promissory estoppel. That element is lacking, asserts defendant, because plaintiff is unable to prove it was damaged in reliance on the short form bulk transfer notice.

The trial court's finding that plaintiff proved all the elements of promissory estoppel should not be reversed unless it is against the manifest weight of the evidence. (*Illinois Valley Asphalt, Inc. v. J. F. Edwards Construction Co.* (1980), 90 Ill. App. 3d 768, 413 N.E.2d 209.) The elements of promissory estoppel are: (1) an unambiguous promise; (2) reliance on such promise by the promisee; (3) the promisor expects and foresees such reliance; and (4) the promisee relies on the promise to his injury. *Illinois Valley Asphalt, Inc.*, 90 Ill. App. 3d 768, 413 N.E.2d 209.

■ We find the evidence sufficient to uphold the trial court's holding that defendant is liable under a theory of promissory estoppel. The bulk transfer notice stated: "All debts of Walter E. Davenport doing business as Pontiac Eisner Food Store will be paid *in full* as they fall due *as a result* of this transaction." (Emphasis added.) This was an unambiguous promise on the part of the buyer-defendant that the closing proceeds would be sufficient to pay all existing debts of the transferor business. The trial court interpreted the notice as follows:

> "Looking at the Bulk Transfer Notice that was sent out to the Plaintiff and other creditors, the final paragraph is, in my way of thinking, quite clear. It's a flat statement that all debts of Walter Davenport will be paid in full as they fall due as a result of this transaction.
>
> · And I realize there's been testimony that Mr. Davenport personally told Mr. Petty that he would obtain a job in the future and pay any debts that would be left over after this sale, but that's not what this notice says. This notice doesn't say that from future income Mr. Davenport will pay any unpaid debts but rather it says it will be paid as a result of this transaction. *** Is this reasonable for the Plaintiff to rely on this? I would think so."

Furthermore, it is evident plaintiff relied on the short form notice when he failed to take action to collect the debt and continued to supply merchandise, even after receipt of defendant's bad check. Such reliance is expected by and foreseeable to parties involved in a bulk transfer transaction.

The trial court, however, was bothered by the element of damages in this case, and we agree it is subject to conjecture. If plaintiff had been given the long form notice, what could it have done to collect defendant's debt?

At trial, plaintiff said if it had received the long form it would have deduced that the amount owed the long list of creditors and lien holders was much greater than the purchase price; therefore, defendant's debts were not going to be paid in full as they fell due. Under section 2—702(2) of the Uniform Commercial Code: "Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within 10 days after the receipt." Ill. Rev. Stat. 1985, ch. 26, par. 2—702(2).

In this case plaintiff could not have relied on section 2—702. Evidence at the bench trial, an invoice, showed that May 3, 1985, and September 13, 1985, were the last dates defendant received goods from plaintiff. The dollar amounts of the goods purchased on those dates were $23.55 and $5.40 respectively. The bulk transfer notice was dated September 21, 1985; therefore the items purchased on May 5, 1985, were beyond the 10-day limit. Plaintiff's right to the September 13, 1985, goods may have been similarly lost, depending on when plaintiff received and was able to act on the notice. Even assuming plaintiff acted swiftly, section 2—701 would entitle it to goods worth only $5.40.

On appeal, plaintiff argues it could have exercised a variety of preclosing remedies such as temporary injunctive relief, attachment, and negotiation. (See Sabin, *Pragmatic Aspects of Bulk Transfer Creditors' Rights*, 74 Ill. B.J. 550 (1986).) Specifically, plaintiff missed the opportunity to challenge the validity and priority of the liens, file suit to enjoin the closing, recover possession of the merchandise, refuse further deliveries, or discover other assets belonging to the Davenports.

In reliance on *Union National Bank & Trust Co. v. Carlstrom* (1985), 134 Ill. App. 3d 985, 481 N.E.2d 300, the trial court abandoned its doubts about damages and held that proof of such preclosing remedies need not be conclusive when the plaintiff might have mitigated his damages had he received proper notice in the long form. In *Carlstrom*, Mrs. Carlstrom asserted the defense of equitable estoppel in an action by the bank to enforce a guaranty clause. She based her theory on the bank's failure to inform her during divorce negotiations of her liability as a guarantor on a loan made to her ex-husband. There was evidence the bank's vice-president was aware of the guaranty's existence during the negotiations, but made no mention of it.

The bank argued Carlstrom failed to prove detrimental reliance because the guaranty could not have been revoked unless the notes were paid off; therefore, Carlstrom was not damaged by the bank's deliberate failure to advise her. The court held Mrs. Carlstrom was damaged because her detrimental reliance on the bank's omissions caused her divorce attorney to take no steps in the property settlement negotiations to protect her. The court held:

"That the proof of detrimental reliance is somewhat conjectural does not defeat the defense. It is not necessary to prove that the steps taken would have been successful. Rather,

'It is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he *might have* retrieved his position and saved himself from loss.' (Emphasis added.) (3 Pomeroy, Equity Jurisprudence sec. 812 (5th ed. 1941).)" *Carlstrom*, 134 Ill. App. 3d at 992, 481 N.E.2d at 304.

While it would have been preferable for plaintiff to have demonstrated in the trial court the remedies, other than section 2–702, it would have pursued and the likelihood of recovery in order to clarify the damage element, we do not believe it was required in light of *Carlstrom*. We find defendant's improper use of the short form bulk transfer notice caused plaintiff to detrimentally rely on the assurance Davenport's debts would be paid off as a result of the transfer. Plaintiff is entitled to judgment against defendant in this case because plaintiff's reliance on the improper short form notice caused it to refrain from taking *any* action to lessen the damage. We recognize the consideration paid for the transfer was not enough to satisfy the secured creditors and that the remedies plaintiff could have employed but for its detrimental reliance are somewhat conjectural. Nonetheless, we believe the trial court's judgment was not against the manifest weight of the evidence on the issue of promissory estoppel.

■■ Next we must determine whether the trial court's finding that plaintiff established all the elements of fraud alleged in count II was against the manifest weight of the evidence.

The elements of fraudulent misrepresentation require proof the statement was: "(1) of a material nature, (2) untrue, (3) known by the person making it to be untrue, believed by him to be untrue, or made in culpable ignorance of its truth or falsity, (4) relied upon by the victim to his detriment, (5) made for the purpose of inducing the reliance, and (6) such that the victim's reliance led to his injury." (*Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 653, 418 N.E.2d 506, 508.) The parties do not dispute the materiality of the statement made in the

bulk transfer notice. However, defendant asserts the notice was not fraudulent because he did not believe it was untrue. Defendant mistakenly believed Walt Davenport's representation that he would pay off all of his own debts. Although the elements of reliance and damages have already been discussed and established, the element of fraudulent intent is absent from this case.

"Fraud *** implies a wrongful intent—an act calculated to deceive." (*Dahlke v. Hawthorne, Lane & Co.* (1966), 36 Ill. 2d 241, 245, 222 N.E.2d 465, 467.) It is true defendant used the improper form of bulk transfer notice; however, the evidence suggests the impropriety was the product of innocent mistake, rather than an.intent to deceive. The notice stated: "All debts will be paid ***." A "prophecy of future developments" or a promise to perform a future act, even if the promisor does not anticipate any developments or intend to perform is insufficient to constitute fraud unless there is a *scheme* to defraud. (*Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909, 914, 410 N.E.2d 55, 59; *Zaborowski v. Hoffman Rosner Corp.* (1976), 43 Ill. App. 3d 21, 24, 356 N.E.2d 653, 655-56.) The facts of this case do not demonstrate defendant was involved in a scheme or device to defraud plaintiff even though defendant's misrepresentation and plaintiff's reliance thereon facilitated the smooth closing of the transaction 16 days after the date of the notice.

Defendant argues plaintiff was not, under the facts of this case, justified in relying on the representation made in the bulk transfer notice. The facts presented in support of this assertion are: (1) the bulk transfer notice stated all future bills were to be sent to Walter Davenport at his home address, (2) plaintiff testified at trial that Walter Davenport had been a "bad payer" for a period of nine months prior to plaintiff's receipt of the bulk transfer notice on September 21, 1985, and (3) plaintiff received a bad check from Davenport on September 19, 1985. However, the stronger policy argument is that plain-. tiff did not have a duty to determine if defendant's notice was issued in good faith even in light of its troublesome business relationship with Davenport. To require as much would put a great burden on creditors and would make the notice requirement of article 6 a meaningless exercise. We still conclude the trial court's judgment for plaintiff on count II alleging defendant's fraud in connection with the bulk transfer notice is against the manifest weight of the evidence because fraudulent intent is not present.

■ The purpose behind the Illinois version of article 6 of the Code is to give notice to creditors of an impending bulk transfer. The Illinois Code Comment and case law provide remedies available to

creditors when there is noncompliance with article 6 by either party to the transfer, *e.g.*, the seller's creditors received no bulk transfer notice whatsoever. However, there is no case law which addresses the remedy for improper compliance with the notice provisions in article 6. How should the court compensate a creditor who, in accordance with Code policy, received notice of the transfer, but was damaged by its short form?

The trial court compensated plaintiff in the form of a personal judgment against defendant based on a third-party beneficiary theory presented in an article by William D. Hawkland. The author states:

> "A statement by the transferee to the creditors that they will be paid in full probably results in a representation that this event will happen and commits the former to the latter under third-party beneficiary principles. The transferee who promises that the creditors will be paid in full normally protects himself by withholding a sufficient sum from the transfer price to cover the outstanding claims of the creditors. Under that circumstance, his promise to pay the creditors would be enforceable under third-party creditor beneficiary rules. Even where the transferee has not withheld the price or a portion of the price, his promissory statement to the creditors indicates that he has assumed the debts of the transferor and it is highly unlikely that he could escape liability by merely showing that no assumption, in fact, had occurred." *Hawkland, Remedies of Bulk Transfer Creditors Where There Has Been Compliance With Article 6*; 4 Com. L.J. 257, 261 (1969).

Professor Hawkland's third-party beneficiary theory may have been appropriately applied to the instant case if the sales contract explicitly instructed defendant to apply a portion of the consideration to pay off Davenport's creditors. Official section 6—106 requires such a procedure. However, since Illinois has rejected that position we decline to apply it under the guise of a third-party beneficiary theory.

Plaintiff is not entitled to recover as a third-party beneficiary to the sales contract between Davenport and defendant simply because they did not intend to benefit plaintiff directly. The sales contract did not provide a remedy for creditors and there is no evidence the contract was drafted with Davenport's creditors in mind. (*Metro East Sanitary District v. Village of Sauget* (1985), 131 Ill. App. 3d 653, 475 N.E.2d 1327.) Moreover, neither the contract nor the surrounding circumstances support the inference that, as a result of the contract, defendant agreed to personally assume the debts of Davenport. (*Illinois Housing Development Authority v. Sjostrom & Sons, Inc.* (1982),

105 Ill. App. 3d 247; 433 N.E.2d 1350.) Instead, the bulk transfer notice directed all future bills to be sent to Walter E. Davenport at his home address, thus indicating Davenport would remain responsible for his debts.

Finally, "third-party beneficiaries of a contract have no greater rights than the party they wish to claim under." (*Kessler, Merci, & Lochner, Inc. v. Pioneer Bank & Trust Co.* (1981), 101 Ill. App. 3d 502, 508, 428 N.E.2d 608, 613.) The terms of the sales contract do not enable Davenport to legally force defendant to pay Davenport's debts; therefore, even if plaintiff is a third-party beneficiary, his power to demand payment is no greater than Davenport's power. We conclude the trial court's judgment for plaintiff, insofar as it was based on a third-party beneficiary theory, was clearly erroneous on these facts.

■ It is the narrow facts of this case which compel us to find plaintiff is entitled to the proceeds of a personal judgment against defendant in the amount of $8,030.07, the account balance prior to the receipt of the bulk transfer notice. Defendant used the wrong form of bulk transfer notice even though he knew plaintiff would not be paid as a result of the transaction. Although defendant did not act maliciously, he acted with knowledge of facts which, if known to plaintiff, may have saved him some money and merchandise. We do not intend to make a bulk sale buyer the absolute guarantor of the debts of his seller. However, defendant's knowledge of facts in conflict with the representation made in the bulk transfer notice and plaintiff's detrimental reliance on the improper notice is a strong basis, and the only basis, for defendant's personal liability.

For the foregoing reasons, we affirm the order of the trial court on counts I and III insofar as it granted plaintiff personal judgment against defendant for his improper compliance with the notice provisions of article 6 and plaintiff's detrimental reliance thereon. We reject and reverse the trial court's judgment based on the fraud and third-party beneficiary theories contained in counts II and IV respectively.

Affirmed in part; reversed in part.

JUSTICE LUND, specially concurring:

I concur with the result of Justice Knecht's opinion and recognize the validity of his reasoning in finding the existence of promissory estoppel. However, it appears to me that the same result is required by interpretation of the provisions under article 6 of the Illinois Uni-

form Commercial Code—Bulk Transfers (the Code) (Ill. Rev. Stat. 1985, ch. 26, pars. 6—101 through 6—110). A transferee must obtain the list of creditors from the transferor (Ill. Rev. Stat. 1985, ch. 26, par. 6—104), and the transferee must give notice to the creditors (Ill. Rev. Stat. 1985, ch. 26, pars. 6—105, 6—106). Normally, noncompliance results in the purchaser's title being defective and subject to a judgment and levy in favor of the creditors, with the action by creditors to be brought within six months. Ill. Rev. Stat. 1985, ch. 26, pars. 6—108, 6—109, 6—110.

As set forth in Justice Knecht's opinion, the notice under the provisions of section 6—106 of the Code (Ill. Rev. Stat. 1985, ch. 26, par. 6—106) can be in one or two forms. The form used in the present transaction stated the debts of the transferor would be "paid in full as they fall due as a result of this transaction." My interpretation of the intent of the Code would place the burden of guarantor on any transferee who sends out this type of notice. The guarantee would extend to every creditor listed on the transferor's list of creditors provided in compliance with the requirements of section 6—104 of the Code (Ill. Rev. Stat. 1985, ch. 26, par. 6—104).

Who is in a better position to determine whether funds are available? The transferee has the list of creditors and can obtain the amounts of the debts. If it is determined that debts do exceed the sale price, new notices can be prepared or the transaction terminated. As adequately set forth in Justice Knecht's opinion, the creditors are lulled into inaction and deprived of any possible action by the erroneous type of notice. Because of the opportunity of the transferee to correct the improper notice prior to closing and the transferee being in the best position to discover his error, I would extend this guarantor liability to every bulk transaction where the short form notice is given, limited, as previously stated, only by the list provided under section 6—104 of the Code.

By my interpretation of the Code, I do not find it necessary to base my conclusion on Restatement (Second) of Contracts. Restatement (Second) of Contracts §88 (1981).

PRESIDING JUSTICE GREEN, concurring in part and dissenting in part:

I concur in the decision to affirm a judgment in favor of plaintiff and against the defendant in the amount of $8,030.07. I would do so only in regard to count III based upon promissory estoppel. I concur in the decision to reverse the judgments entered in favor of plaintiff in regard to count II sounding in fraud and count IV based upon

plaintiff's being a third-party beneficiary. I dissent from the decision to affirm a monetary judgment in favor of plaintiff and against defendant as to count I, which alleges a violation of article 6 of the Illinois Uniform Commercial Code (Code). Ill. Rev. Stat. 1985, ch. 26, pars. 6—101 through 6—110.

My dissent from the affirmance of the judgment as to count I results from the award of money damages on that count. Article 6 makes no mention of any award of money damages to a creditor for a violation of the article. Rather, as pointed out in section 6—105 of the Code (Ill. Rev. Stat. 1985, ch. 26, par. 6—105), the remedy for a failure of a purchaser to give proper notice is to set aside the sale as to creditors denied proper notice. As Justice Knecht points out, the holding in *Continental Casualty Co. v. Burlington Truck Lines, Inc.* (1966), 70 Ill. App. 2d 405, 408, 217 N.E.2d 293, 295, and the commentary to the Code (Ill. Ann. Stat., ch. 26, par. 6—104, Uniform Commercial Code Comment, at 642 (Smith-Hurd 1963)) indicate that a monetary award to a creditor against a purchaser cannot be based solely on a violation of article 6.

I recognize that, for practical purposes, permitting monetary damages to be awarded on a promissory estoppel basis is much the same as permitting such an award on the basis of an article 6 violation. In most cases the forbearance of the creditor constitutes a sufficient detrimental reliance to support a promissory estoppel. However, I am not inclined to analyze the basis of the recovery on the theory that the statute gives the monetary remedy when the statute does not so state, and strong indication is given that such a statutory remedy was not intended by the legislature. Rather, I would base the recovery upon the promissory estoppel theory exclusively. I would make a slightly different analysis of that theory than does Justice Knecht.

I question the reliance on *Union National Bank & Trust Co. v. Carlstrom* (1985), 134 Ill. App. 3d 985, 481 N.E.2d 300, as a basis for the promissory estoppel award. That case involved the use of the doctrine of *equitable* estoppel as a defense to a suit on a note. There, unlike here, no promises were made. Basing our decision here on analogy to that case gives rise to an inference that when one party violates the rights of another party in regard to a saving or recovery of money, a proper measure of damages is all of the money that might possibly have been recovered or saved. I cannot agree with that theory. For instance, had the fraud count here been established, I would consider an award of the amount here to have been excessive based on the extremely remote likelihood that plaintiff would have been able to recover a substantial sum on the debt of Davenport had proper ac-

curate notice been given.

On the other hand, as Justice Knecht has correctly set forth, the circuit court could find from the evidence that defendant made a written, signed promise to pay Davenport's debts owed to plaintiff and others. The detriment to plaintiff in relying on that promise and forbearing from either seeking to collect from Davenport or stopping the sale was of sufficient substance to serve as a substitute for consideration to hold defendant to his promise. This is so even though success by plaintiff in obtaining such relief was very unlikely. The binding nature of such a promise is defined in the following terms.

"A promise to be surety for the performance of a contractual obligation, made to the obligee, is binding if

\* \* \*

(c) the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee \*\*\*, and the promise does induce such action or forbearance." Restatement (Second) of Contracts §88, at 234 (1981).

Clearly, when a binding promise is made to pay the debt of another, and the debtor fails to pay the debt, the measure of damages against the surety includes the unpaid amount of the debt. Under the terms of section 88, a recovery for $8,030.07 owed by Davenport to plaintiff was appropriate here.