916 F.2d 394
 FIRST WISCONSIN TRUST COMPANY, Plaintiff-Appellee,
v.
Donald F. SCHROUD, Selim N. Mayer, and State and Savings
Bank, as Trustee under Trust Agreement dated
August 15, 1986, and known as Trust No.
109, Defendants-Appellants.
 No. 89-2602.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1990.
Decided Oct. 18, 1990.
 
 David I. Herbst, Raymond J. Werner, Jodi I. Firfer, Ronald A. Damashek, Portes, Sharp, Herbst, Kravets & Fox, Chicago, Ill., for plaintiff-appellee.
 Anthony C. Valiulis, Arthur E. Rosenson, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for defendants-appellants.
 Before CUDAHY, KANNE, Circuit Judges, and PELL, Senior Circuit Judge.*
 KANNE, Circuit Judge.
 
 
 1
 First Wisconsin Trust Company ("First Wisconsin") sought to recover from Donald Schroud, Selim Mayer, and State and Savings Bank ("Schroud and Mayer" collectively) the sum of $105,709.46 in deferred interest payments. These interest payments were owed to First Wisconsin by Schroud and Mayer who inadvertently received them--and, thereafter, purposefully retained them--as part of the proceeds from their sale of encumbered real estate.
 
 
 2
 Schroud and Mayer requested leave to amend their answer to formally plead an "estoppel" defense to First Wisconsin's "unjust enrichment" claim. The district court granted summary judgment in favor of First Wisconsin. Thereafter, the district court denied Schroud and Mayer's request for leave to amend their answer concluding as a matter of law that their allegations could not support such an equitable defense. This appeal followed. We affirm.
 
 I.
 A. The Parties and Financial Instruments
 
 3
 First Wisconsin, as its name would suggest, is a Wisconsin corporation having its principal place of business in Wisconsin. Dutch Gap Properties and State and Savings Bank are Indiana corporations having their principal places of business in Indiana. Donald Schroud and Selim Mayer are citizens of Illinois.
 
 
 4
 While the issue before us is simple, the background of the case involves a series of transactions in a complex financial arrangement. On October 1, 1964, Dutch Gap Properties borrowed $1,191,000 from Teacher's Insurance and Annuity Association of America ("TIAA") and, in evidence of that loan, issued a 5 3/8% promissory note for that amount ("original note"). The original note was secured by an earlier-dated mortgage between Dutch Gap as mortgagor and TIAA as mortgagee which encumbered certain real property located in Monticello, Indiana ("the property"). TIAA subsequently assigned its interest in that mortgage to First Wisconsin in an instrument dated October 10, 1967, thereby making First Wisconsin the trustee under the mortgage. In a separate instrument between Dutch Gap and First Wisconsin, also dated October 10, 1967, Dutch Gap exchanged the original note for a separate secured note in the principal sum of $1,191,000 ("the Series A Note"). In this same instrument, Dutch Gap and First Wisconsin modified the terms of the earlier mortgage; the modified document shall be referred to as the Mortgage.
 
 
 5
 The amount in controversy in this case results exclusively from the deferred interest provision of the Series A Note. That provision states:
 
 
 6
 In addition to current interest hereon at the rate of 5 3/8% per annum, this Note shall bear additional interest at the rate of 1/4% per annum on the unpaid principal hereof from time to time outstanding from the date hereof to maturity, and the amount of such additional interest which has accrued at the date of each Instalment Payment from the date of the next preceding Instalment Payment shall bear interest at a rate of 5 5/8% per annum compounded quarterly from the date of such Instalment Payment to maturity, in each case computed in the manner specified above with respect to current interest on this Note. All such additional interest and interest thereon is herein called deferred interest.
 
 
 7
 The Mortgage, which secured the Series A Note, provided in pertinent part, "Deferred interest which has accrued on such Series A Note shall be payable on the maturity of such Series A Note, whether by acceleration or otherwise, or upon the prepayment in whole of such Series A Note."
 
 B. Schroud and Mayer Purchase the Property
 
 8
 In August of 1986, Schroud and Mayer purchased the property located in Indiana and assumed the Mortgage under which the property was encumbered. Title to the property was taken through a Trust Agreement dated August 15, 1986 ("Trust No. 109") executed by State and Savings Bank. Under Trust No. 109, State and Savings Bank owned the Monticello property as Trustee; Schroud and Mayer were the owners of the beneficial interest in the trust. Shortly thereafter, Schroud and Mayer contacted First Wisconsin and requested an accounting of the liability which they had assumed (via the Mortgage) under the Series A Note. In a letter dated September 2, 1986, First Wisconsin informed Schroud and Mayer that the outstanding principal amount on the note was $254,094.11 and that the accrued deferred interest was $95,021.50. First Wisconsin further informed Schroud and Mayer that the deferred interest amount would amortize up to $96,519.68 by October 15, 1986.
 
 C. Schroud and Mayer Sell the Property
 
 9
 On January 14, 1988, Trust No. 109 executed a contract for the sale of Schroud and Mayer's property. Under the terms of that contract, Schroud and Mayer were obligated to transfer the property free of any liens or leases. As a result of this obligation, Schroud and Mayer held negotiations with the primary tenant on the property, Harnischfeger Corp., in an attempt to obtain compensation for their release of Harnischfeger's lease obligations. These negotiations were ultimately unsuccessful. In support of their estoppel argument, however, Shroud and Mayer argue that they chose to release Harnischfeger without penalty because they were satisfied with the return they were getting from the sale of the property.
 
 
 10
 On or about March 8, 1988, Schroud and Mayer's attorneys contacted First Wisconsin and requested that a "payoff-letter" be issued informing them of their obligations in paying off the Series A Note in full on April 15, 1988, the anticipated date of the sale of the property. Pursuant to that request, Donald Mayer, a Senior Trust Officer with First Wisconsin, enlisted Jo Ann Schalk, an administrative assistant, to prepare that payoff letter. In turn, Ms. Schalk asked Susan Barnes, the supervisor of First Wisconsin's billing department, to obtain the payoff figures. Finally, Ms. Barnes instructed Yvonne Siira, a First Wisconsin employee on the bottom rung of this corporate ladder, to do the "leg work" on those calculations.
 
 
 11
 Herein lies the foundation of the problem which we resolve today. In calculating the amount due to pay off the Series A Note, Ms. Siira did not refer to the Mortgage, to the note itself, or to any other loan document. Rather, she relied on First Wisconsin's computer system to obtain the principal amount outstanding on the note. Once she had obtained this figure, she manually determined the amount of "current" interest that would be due through April 15, 1988. Unfortunately, First Wisconsin's computer did not reveal to Ms. Siira the fact that "deferred interest" was also due. Consequently, the payoff letter which Ms. Schalk delivered to Schroud and Mayer's counsel, dated March 15, 1988, stated only that $142,283 in principal and $1,911.93 in interest was due on the note; it did not reflect the fact that Schroud and Mayer owed First Wisconsin an additional $105,709.46 as deferred interest.
 
 
 12
 The closing on Schroud and Mayer's sale of the property occurred in Indiana on April 6, 1988. Chicago Title Insurance Co., acting as escrow agent through its Indiana office, held $2,051,000 for disbursement to the various parties to the transaction. Because Schroud and Mayer did not attend the closing, Chicago Title held their proceeds from the sale for approximately ten days and then transferred those proceeds to Schroud and Mayer's bank accounts in Illinois. The transfer was undertaken at the request of Schroud and Mayer's attorneys.
 
 
 13
 Shortly after the closing, Donald Mayer (First Wisconsin's Senior Trust Officer) received a phone call from a representative of TIAA to confirm the payoff figures for the Series A Note. During the course of that conversation, Mr. Mayer was informed that deferred interest in the amount of $105,709.46 was owed on the Series A Note. Ms. Schalk immediately prepared a revised payoff letter, dated April 14, 1988, advising Schroud and Mayer's attorneys of the fact that this amount, accidentally omitted from the original payoff letter, was also owing on the Series A Note. First Wisconsin never received the $105,709.46 from Schroud and Mayer. The underlying dispute resulted.
 
 II.
 
 14
 In granting summary judgment in favor of First Wisconsin on Count Two, the district court made three rulings, each of which Schroud and Mayer challenge on review. First, the district court was presented with a choice-of-law issue as to whether Indiana or Illinois state law would apply. Applying Illinois choice-of-law rules, the district court concluded that Indiana substantive law would govern First Wisconsin's claim. Second, under Indiana substantive law, the district court held that First Wisconsin's failure to request deferred interest in the March 15 payoff letter was a "mistake of fact" recoverable under an unjust enrichment theory. Finally, with regard to Schroud and Mayer's petition for leave to amend their answer, the district court held that any amendment would have had no impact on the court's disposition of the summary judgment motions. Before addressing each of these arguments, we briefly visit the principles under which we review a district court's grant of summary judgment.
 
 A. Standard of Review
 
 15
 Our review of a district court's grant of summary judgment is de novo. Continental Corp. v. Aetna Casualty & Surety Co., 892 F.2d 540, 543 (7th Cir.1989). Under the standard set forth in Federal Rule of Civil Procedure 56(c), we first determine whether there are any genuine issues of material fact. If no issues of material fact exist, we determine whether the moving party is entitled to judgment as a matter of law. Thomas v. United Parcel Service, Inc., 890 F.2d 909, 914 (7th Cir.1989). Elaborating on this standard of review, the Supreme Court has stated, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.' " Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Thomas, 890 F.2d at 914.
 
 B. Choice of Law
 
 16
 As a court sitting in diversity, the district court below was obligated to look to the choice-of-law rules of the forum state (Illinois) to determine which state's substantive law would apply. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1943). Consistent with this obligation, the district court determined that Illinois would probably follow the choice-of-law rules set forth in Sec. 221 of the Restatement (Second) of Restitution. See Gold v. Wolpert, 876 F.2d 1327, 1331 (7th Cir.1989) (citing Overseas Development Disc Corp. v. Sangamo Constr. Co., 686 F.2d 498, 511 (7th Cir.1982)). Schroud and Mayer do not dispute this initial conclusion. Rather, the challenge which they raise in this context questions the district court's determination that the provisions of Sec. 221 lead to the application of Indiana rather than Illinois law. We agree with the district court's assessment of this choice-of-law issue.
 
 
 17
 Under Sec. 221 of the Restatement, a court will apply the law of the forum which has the most significant relationship to the occurrence and the parties. In making that determination, the court is instructed to consider the following factors:
 
 
 18
 (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship;
 
 
 19
 (b) the place where the benefit or enrichment was received;
 
 
 20
 (c) the place where the act conferring the benefit or enrichment was done;
 
 
 21
 (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
 
 
 22
 (e) the place where the physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.
 
 
 23
 Section 221 further suggests that these factors are to be considered in light of their relative importance to the particular state-law issue which is before the court. That issue in this case is "unjust enrichment."
 
 
 24
 Schroud and Mayer argue that the relationship between themselves and First Wisconsin was "centered" in Illinois. In support of this position, Schroud and Mayer point exclusively to the fact that all communications between themselves and First Wisconsin were either originated in or received in Illinois. This may be true. The same, however, is true for Wisconsin. In this sense, both Wisconsin and Illinois could be said to be the "center" of the relationship between these two parties. If the origin and destination of the various communications between the parties defines the "center" of their relationship, we are left with very little guidance. The fact that "origins" and "destinations" of communications do not define the "center" of this relationship becomes apparent when we remember the precise issue which is before the court. The claim is for "unjust enrichment" which resulted from the sale of property located in Indiana. In light of this fact, we agree with the district court that the "center," or "focal point," of the relationship between these two parties was in Indiana. Indeed, in the absence of the Indiana property and its sale, Schroud and Mayer would not have the relationship with First Wisconsin which brought them before this court.
 
 
 25
 Schroud and Mayer argue that this analysis under the first factor gives undue weight to the location of the property, particularly in light of the fact that the location of the property is already considered under the fifth factor. We disagree. The question under the first factor is where the relationship between the parties was "centered." The relationship between the parties in this case was "centered" around the parcel of land in Indiana. The fact that their communications went back and forth between Illinois and Wisconsin is merely incidental to this fact. For example, let us assume that the parcel of land was located in Wisconsin and the residences of the two parties remained the same. In this hypothetical, the communications between the parties would still pass back and forth between Wisconsin and Illinois. With only the origin and destination of the communications to consider, it is not clear which state had the more "significant" relationship to the unjust enrichment claim. Throw in the fact that the parcel of land is located in Wisconsin, however, and it becomes clear that Wisconsin would be the state with the more significant relationship to the claim. The fact that this analysis considers as relevant the location of the parcel of land does not do damage to the fact that the fifth factor also considers the location of the parcel of land. Rather, we believe it serves to ensure that the state with the more significant interest will be chosen as the state whose law applies.
 
 
 26
 The second factor looks to the place where the benefit or enrichment was "received." Because Schroud and Mayer did not attend the closing in Indiana, they did not "receive" the proceeds of the sale--or the unjust enrichment--in the physical sense until Chicago Title, acting as escrow agent, wired those amounts to their bank accounts in Illinois. Chicago Title disbursed the Schroud and Mayer's proceeds to Illinois nearly ten days after the closing date only after receiving authorization to do so from Schroud and Mayer's attorneys. During that interim period, Chicago Title held the funds in Indiana and invested them on behalf of the purchasers of the property as it was instructed to do under the terms of the escrow agreement.[1]
 
 
 27
 We do not dispute Schroud and Mayer's argument that they did not "physically" receive the benefit from the proceeds of the sale until those proceeds were deposited in their bank accounts in Illinois. The fact remains, however, that under Paragraph 8(v) of the escrow agreement, Chicago Title was obligated to hold Schroud and Mayer's portion of the sale proceeds and remit those proceeds to their accounts "in accordance with further direction to be received from [Schroud and Mayer]." In this regard, it is apparent that Schroud and Mayer were in constructive receipt of the funds prior to the time that they physically received them in Illinois. Cf. Madding v. Indiana Dep't of Revenue, 149 Ind.App. 74, 270 N.E.2d 771, 777 (1971) (under long-established doctrine of constructive receipt, a taxpayer has received income if it is "available to him without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is made"). For purposes of determining where the benefit was "received" under the Restatement Second's choice-of-law provisions, we believe this is all that is required. As such, we agree with the district court that Schroud and Mayer received the benefit in Indiana.
 
 
 28
 The third factor asks for the place where the act conferring the benefit was done. The payoff letter which contained the erroneous calculations was prepared in Wisconsin. The actual disbursement of the funds under those erroneous calculations was done by Chicago Title in Indiana. Thus, it appears that Wisconsin and Indiana have an almost identical interest in this transaction under this factor; Illinois has none.
 
 
 29
 The fourth factor provides little guidance under these facts in that each state is almost equally represented: Schroud and Mayer are citizens of Illinois; First Wisconsin has its principal place of business in Wisconsin; and State and Savings Bank has its principal place of business in Indiana. The fifth and final factor points exclusively to Indiana; the parcel of land which served as the "focal point" for the relationship between the parties is located in Indiana.
 
 
 30
 Upon consideration of all of these factors, we agree with the district court that Indiana has the most significant relationship to these proceedings. Accordingly, we will examine the viability of First Wisconsin's "unjust enrichment" claim under Indiana's substantive law.
 
 C. Unjust Enrichment under Indiana Law
 
 31
 The district court concluded that because First Wisconsin's mistake in computing the amount due in the March 15 payoff letter was one "of fact," Schroud and Mayer were obligated under equity and good conscience to make restitution to First Wisconsin in the amount of the deferred interest accrued on the Series A Note. See Stafford v. Barnard Lumber Co., Inc., 531 N.E.2d 202, 204 (Ind.1988); Indianapolis Raceway Park v. Curtiss, 179 Ind.App. 557, 386 N.E.2d 724, 726 (1979). Schroud and Mayer argue that the district court erred as a matter of law in this respect. Specifically, Schroud and Mayer argue that First Wisconsin's error in computation with regard to the March 15 payoff letter was a "mistake of law" and, as such, not recoverable under Indiana law.
 
 
 32
 Schroud and Mayer are correct in stating that monetary losses which are incurred as a result of a "mistake of law" are not recoverable under Indiana law. See City of Evansville v. Walker, 162 Ind.App. 121, 318 N.E.2d 388, 389 (1974) ("a voluntary payment made under a mistake or in ignorance of law, but with full knowledge of all the facts, and not induced by any fraud or improper conduct on the part of the payee, cannot be recovered back") (quoting 23 I.L.E., Payment Sec. 43, p. 136). It strains credibility, however, to argue--as Schroud and Mayer do--that the mistake committed by First Wisconsin in its computation of the amount due on the Series A Note amounted to one "of law."Schroud and Mayer's argument that First Wisconsin's mistake in drafting the March 15 payoff letter was a "mistake of law" is largely unsupported. According to Schroud and Mayer, the mistake could not have been one "of fact" because First Wisconsin was generally aware when it drafted the payoff letter that it was supposed to receive $105,709.46 in deferred interest upon maturity or prepayment of the Series A Note. This statement simply assumes the desired result without providing a convincing explanation. Perhaps there are rare individuals who have never accidently overlooked something about which they were generally aware; the large majority of us have. Even more damaging to Schroud and Mayer's argument, however, is that while they refer vaguely to a mistake "of law," they have neglected to refer to any principle of law--either statutory or of the common law variety--which First Wisconsin is supposed to have voluntarily made a mistake under or acted in ignorance of. Indeed, a more plausible explanation of First Wisconsin's troubles--and one supported by the undisputed facts--is that First Wisconsin simply made a clerical error in the computation of the amount due on the Series A Note. This mistake ultimately led to Schroud and Mayer's unjust enrichment in that amount; undeniably an amount to which they have no legitimate claim. This is the type of mistake of fact which has long been held to be correctable under Indiana law. See Markel's Administrator v. Spitler's Administrator, 28 Ind. 488, 491 (1867) ("A material error in an instrument of writing, caused by a mistake of fact, may, as between the parties thereto, be corrected."); see also 23 I.L.E. Sec. 44, p. 137. In this case, the correction is properly accomplished through First Wisconsin's recovery on its unjust enrichment claim.
 
 D. Motion to Amend Answer
 
 33
 After the close of discovery, and after motions for summary judgment had been filed by each party, Schroud and Mayer filed a motion for leave to amend their answer to formally plead the affirmative defense of "estoppel." The district court correctly denied this motion.
 
 
 34
 Schroud and Mayer's estoppel defense would have been premised upon an argument that they relied upon First Wisconsin's payoff letter in releasing Harnischfeger Corp. from its lease without penalty. According to Schroud and Mayer, if they had known that an additional $105,709.46 would be required to retire the Series A Note, they would not have released Harnischfeger from its lease obligations without extracting some form of compensation. Whether Schroud and Mayer would have been successful in its negotiations with Harnischfeger had First Wisconsin's payoff letter included the deferred interest amount is a question of fact potentially material to an estoppel defense. We need not address that issue, however, in that Schroud and Mayer cannot recover under an estoppel defense as a matter of law.
 
 
 35
 As the district court noted in denying Schroud and Mayer's motion to amend, in order to prevail under an estoppel theory Schroud and Mayer must show that they were ignorant of their obligation to pay the interest. Glaser v. Dep't of Public Welfare, 512 N.E.2d 1128, 1130 (Ind.App.1987); Alber v. Standard Heating & Air Conditioning, 476 N.E.2d 507, 510 (Ind.App.1985); State v. Lugar, 171 Ind.App. 60, 354 N.E.2d 755, 765 (1976). Schroud and Mayer were unquestionably aware of their obligation to pay the accrued deferred interest at time of maturity or prepayment of the Series A Note. Schroud and Mayer had been informed on at least three occasions that upwards of $95,000 had accrued in deferred interest as of September, 1986--deferred interest which they would owe upon maturity or prepayment in full of the Series A Note. In light of these facts, we agree with the district court, that "the defendants' belated claim of ignorance in the face of this evidence is unpersuasive."
 
 III.
 
 36
 For all of the foregoing reasons, we AFFIRM the decision of the district court granting summary judgment in favor of First Wisconsin.
 
 
 
 *
 Judges Posner, Ripple and Kanne constituted the original panel which heard oral argument in this case. During oral argument, information was disclosed regarding a non-party's potential interest in the outcome of these proceedings. Judges Posner and Ripple did not participate in any discussion of the case in conference and subsequently recused themselves when the non-party's interest was confirmed. Circuit Judge Cudahy and Senior Circuit Judge Pell were assigned to replace Judges Posner and Ripple
 
 
 [1]
 Submitted with the merits of this case on appeal is Schroud and Mayer's Amended Motion to Amend Designation of Record on Appeal. Specifically, Schroud and Mayer wish to amend the record by including the escrow agreement which, although an exhibit in Selim Mayer's deposition below, was not designated as part of the record on appeal. Schroud and Mayer brought a similar motion before the district court, arguing that it was necessary to amend the record in this manner so as to be able to respond to First Wisconsin's use of the escrow agreement in their Reply Brief. The district court denied that motion without discussion. Because the escrow agreement serves as the only document which indicates on whose behalf Chicago Title held the funds prior to disbursement, we reverse the district court's denial of Schroud and Mayer's motion to amend and will consider the contents of that document in our resolution of this choice-of-law issue