Dennis W. HOORNSTRA, Plaintiff,

v.

UNITED STATES of America,
Defendant–Appellee,

and

The State of Illinois, Defendant–
Appellant.

No. 91–2171.

United States Court of Appeals,
Seventh Circuit.

Argued April 29, 1992.

Decided Aug. 3, 1992.

Dennis W. Hoornstra, pro se.

Eileen M. Marutzky, Asst. U.S. Atty., Criminal Div., Chicago, Ill., Gary R. Allen, David I. Pincus, Jordan L. Glickstein (argued), Mark Winer, Dept. of Justice, Tax Div., Appellate Section, Washington, D.C., for defendant-appellee.

Deborah L. Ahlstrand, Asst. Atty. Gen. (argued), Office of Atty. Gen., Chicago, Ill., for defendant-appellant.

Before FLAUM and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

KANNE, Circuit Judge.

In this interpleader action, the United States of America and the State of Illinois raise competing claims to the funds of an escrow account. The district court granted summary judgment in favor of the United States. 764 F.Supp. 107. We reverse.

The relevant facts are not in dispute. Malcolm Quick contracted to buy from the Southwest Mini Mart Corporation ("Mini Mart") all the assets of a Mini Mart store in Aurora, Illinois. The purchase price was $50,000. Of this amount, $25,000 was allocated for the broker's commission and the store's past due rent. The remaining $25,000 was placed in escrow—pursuant to the contract—to cover any outstanding taxes, penalties or interest owing the United States or the State of Illinois. The contract further specified that these funds—less any amount subsequently claimed by the United States or the State of Illinois—would only be released to Mini Mart upon notice from the Illinois Department of Revenue (IDR) that all tax liabilities had been extinguished. Quick's attorney, Dennis Hoornstra, was designated the escrow agent.

The IDR eventually contacted Hoornstra, but with some unexpected news. By the IDR's account, Mini Mart still owed the State of Illinois over $104,000 in state sales taxes, for which reason a bulk sales stop order had been issued. *See* Retailers' Occupation Tax Act, Ill.Rev.Stat. ch. 120, § 444j (Smith–Hurd Supp.1990) (authorizing bulk sales stop orders for unpaid state sales taxes). Hoornstra also learned that Mini Mart owed the United States $49,805 in unpaid federal employment taxes. Unfortunately, Mini Mart lacked the finances to cover these liabilities—and, apparently, all its other debts as well, for on November 27, 1987, it filed for bankruptcy. Since the bankruptcy estate did not have enough assets to fully satisfy the claims of either tax creditor, Hoornstra filed this interpleader action in federal court to determine who was entitled to the escrowed funds.

The United States and the State of Illinois filed cross-motions for summary judgment. Both acknowledged that the Internal Revenue Service (IRS) was the first party to file its tax liens against the escrow. However, the State countered that Mini Mart had no property interest in the escrow to begin with, meaning that the IRS had—essentially—a priority tax lien against nothing. In that case, continued the State, the United States would only be entitled to the escrow—according to the terms of the contract—if the tax owed was either a sales tax or a tax for which Quick was contingently liable under the Internal Revenue Code. The State maintained that the tax due the United States failed to meet either description, and hence deserved nothing as beneficiary of the fund.

The district court disagreed with the State's contention and entered summary judgment in favor of the United States. Relying primarily on our opinion in *Bjork v. United States*, 486 F.2d 934 (7th Cir. 1973), the court reasoned that the State's stop order did not divest Mini Mart of its beneficial interest in the escrow account, but merely interrupted Mini Mart's ability to take possession of the escrowed funds. Accordingly, the court concluded that the federal tax liens could attach, and that those liens had priority over any claims raised by the State. This appeal followed.*

Our standard of review for this sort of case is well-established. We review the district court's entry of summary judgment *de novo*, drawing all reasonable inferences in the non-moving party's favor. *Santella v. Chicago*, 936 F.2d 328, 331 (7th Cir.1991); *First Wisconsin Trust Co. v. Schroud*, 916 F.2d 394, 398 (7th Cir.1990). An entry of summary judgment will be upheld only if we can determine from the record that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c); *Schroud*, 916 F.2d at 398.

■ As the district court correctly recognized, the threshold question in this case, as in all cases where the federal government asserts a tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach. *Aquilino v. United States*, 363 U.S. 509, 512, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). In answering that question, state law governs our inquiry into whether the taxpayer had property or rights to property in the subject sought to be attached. *Id. See also United States v. Rodgers*, 461 U.S. 677, 683, 103

S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *Tillery v. Parks*, 630 F.2d 775, 776 (10th Cir.1980). Once it is established that a cognizable property interest exists, however, we then turn to federal law to determine the priority of all existing liens. *Aquilino*, 363 U.S. at 513–14, 80 S.Ct. at 1280–81. *See also* 26 U.S.C. § 6321 (federal law determines the priority of federal tax liens in any contest with other liens or interests). Federal liens which arose first in time will generally have priority over subsequently filed competing liens. *See United States v. City of New Britain*, 347 U.S. 81, 84–85, 74 S.Ct. 367, 370–71, 98 L.Ed. 520 (1954); *United States v. Pioneer American Ins. Co.*, 374 U.S. 84, 87, 83 S.Ct. 1651, 1654–55, 10 L.Ed.2d 770 (1963).

■ Here, the district court found *Bjork* to be dispositive on the issue of whether Mini Mart had a cognizable property interest in the escrow. In *Bjork*, the seller—Cline Letter Service, Inc.—made a bulk transfer of a gift shop and office supply business to the purchaser. Before the sale was consummated, the State of Illinois discovered a $2,500 deficiency in the seller's sales tax payments and, as a result, a bulk sales stop order was issued. The purchaser responded by directing his attorney to hold that amount in escrow pending a determination of the exact amount of tax owing to the State. In the meantime, the IRS had also assessed income tax withholding, social security and unemployment taxes against the seller in the amount of $2,323.69; the United States quickly served a notice of levy on the taxpayer, and filed the notice in the appropriate public office. When the State and the federal government could not come to an agreement as to who should have priority to the fund, the

* This appeal is brought pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. As was done in this case, Rule 54(b) allows a district judge to certify for immediate appeal an order that disposes of one or more but fewer than all of the parties or claims in a case, provided the judge makes an express determination that there is no just reason to delay the entry of judgment. *Johnson v. Levy Organization Co., Inc.*, 789 F.2d 601, 607 (7th Cir.1986). Here, the dismissal of Hoornstra, the interpleading plaintiff, was conditioned on his deposit of $25,000

with the court. The plaintiff supplied the clerk of the court with $19,437.05 but has yet to pay in the balance of the $25,000. The conditions of Hoornstra's dismissal have not yet been met and therefore he remains a party to this action. The district judge resolved the priority of claims raised by the United States and the State of Illinois, but no order was entered specifically disposing of the escrowed funds. These are matters for the district court to resolve on remand.

purchaser's attorney filed an interpleader action.

As in the instant litigation, the central issue before the court in *Bjork* was whether, under Illinois law, the tax-payer-seller had a sufficient property interest in the escrow account when the federal tax liens were filed. We held that it did. In reaching this conclusion, we reasoned that the stop order did not interrupt the transfer of the taxpayer-seller's beneficial interest in the fund, but merely interrupted its right to possession. According to the *Bjork* court,

> [T]he most reasonable interpretation of the effect of a stop order is that it insures some cache of the seller's property from which to satisfy the seller's tax liability only insofar as no perfected lien attaches to the fund prior to the determination of the amount of such liability to the State.

486 F.2d at 938.

While we recognize that the similarities between *Bjork* and the instant case seem compelling, we agree with the State's contention that *Bjork* is distinguishable. Here, Malcolm Quick protected himself from transferee liability by negotiating for a contract provision which *expressly conditioned* payment of the escrow funds upon Mini–Mart's satisfaction of all tax liabilities, or upon release of a stop order. The purchaser in *Bjork*, by contrast, did not make any analogous contractual arrangement—he simply withheld an amount equal to the state tax deficiency based only on the authority of the stop order. But by that point the taxpayer-seller had already fulfilled his part of the bargain and thereby acquired a legal stake in those withheld funds. As the *Bjork* court pointed out,

> Immediately before the transfer, [the purchaser] had the beneficial interest in the fund. Absent a stop order, there is no question but that the beneficial interest in what became the fund would have shifted to [the seller] at the time of the transfer. This result is dictated by the contract ... by which [the purchaser] agreed to give [the seller] a full $13,000 in cash in return for [the seller's] busi-

ness assets. Since the Seller performed his part of the bargain, had there been no stop order [the seller] would have prevailed against [the purchaser] in an action to recover the [withheld amount].

486 F.2d at 937. Put another way, while the absence of a stop order in *Bjork* would have entitled the seller to the full purchase price under the contract, the absence of a stop order in the instant case would still have left the parties here with their contractual obligations intact. And that meant Mini–Mart could not acquire any interest in the escrow until it delivered an IDR release.

█ The district court rejected this distinction because it believed that the parties' contract merely reiterated the provisions of section 5j of the Retailers' Occupation Tax Act—a provision which already required the purchaser to withhold the amount of the sales tax deficiency. *See* Ill.Rev.Stat. Ch. 120, § 444j. This reasoning, unfortunately, blurs the line between a privately-created legal relationship—such as an escrow or trust—with the requirements of section 5j. Under Illinois law, an escrow is traditionally a written instrument whereby property of the obligor is held by escrowee until the performance of a condition or happening of an event after which the property is then turned over to the obligee. *Crest Finance Co. v. First State Bank of Westmont*, 66 Ill.App.2d 364, 214 N.E.2d 526, 532–33 (1st Dist.1966); *Rinehart v. Rinehart*, 14 Ill.App.2d 116, 143 N.E.2d 398, 402 (3rd Dist.1957). But section 5j bears out no such formalities; it does not require that any written instrument be drafted to govern the withheld funds; it does not require the designation of an escrowee; and it does not specify any other condition upon which title may pass except when a state tax deficiency is determined. In short, funds withheld under 5j do not deserve the legal characterization of an escrow.

A brief review of the escrow at issue today makes this distinction even clearer. Although similar to section 5j, the parameters of the escrow created here are broader in scope. To begin with, the escrow man-

dates that a full $25,000 be withheld, whereas section 5j requires withholding of an amount "as directed by the [IDR], but not to exceed a minimum amount varying by type of business...." It also covers both federal and state taxes; section 5j is applicable only to state taxes. Hence, we agree with the State's contention that the district court erred in granting summary judgment to the United States on the basis of *Bjork*. In our view, the presence of a contract with explicit conditions precedent is sufficient to take this case out of the *Bjork* line of authority.

■ Having rejected the United States' claim, it only remains for us to determine whether the State's claim is any better. On its face, paragraph 5(c) of the contract appears to require that the $25,000 escrow be withheld not only for the benefit of the State, but also for the benefit of the United States:

> Sales, Use and Unemployment Taxes—Buyer's attorney at law, shall withhold Twenty Five Thousand and 00/100 Dollars from the purchase price to cover the amount of 1) all taxes, penalties and interests which may be due the United States of America and/or the State of Illinois from the Seller under any [sic] all sales, use and occupation tax statutes or for which the Buyer may be contingently liable under the Internal Revenue Code and the Illinois Revised Statutes.

However, we believe that the above language does not benefit the IRS because the IRS does not collect "sales, use or occupation taxes"; its only claim here is unpaid federal unemployment taxes. Moreover, the United States has never established that Quick is contingently liable to the IRS under any provision of the Internal Revenue Code. That means that the State of Illinois' claim carries the day, and thus we conclude that the district court should have entered summary judgment in the State's favor.

The district court's entry of summary judgment in favor of the United States is REVERSED, and the matter is REMANDED for proceedings consistent with this opinion.